# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **LORI T. PRICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:14cv0049 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Lori T. Price (Plaintiff) for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the undersigned by the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for SSI in August 2010, alleging she was disabled as of July 15, 2009, by bipolar disorder, chronic migraines, attention deficit hyperactivity disorder (ADHD), anxiety disorder, fibromyalgia, and poly-substance dependence. (R.[1] at 157-65, 179.) Her application was denied initially and following a hearing held in June 2012 before Administrative Law Judge (ALJ) Dina R. Loewy. (Id. at 7-21, 46-98, 103-08, 121-34, 147-50.) After reviewing additional evidence, see pages 26 to 27, infra, the Appeals Council

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

denied her request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-4.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Bob Hammond, a vocational expert (VE), testified at the administrative hearing.

Plaintiff, then forty-four years old, testified that she is 5 feet 6 inches tall, weighs 200 pounds, and is right-handed.  (Id. at 53-54.)  She is married and has four daughters, ages 22, 19, 17, and 8.  (Id. at 54.)  Her eight-year old is the only child living with her and is her only child with her current husband.  (Id. at 54-55.)  They live in a one-story house.  (Id. at 55.)  She does not drive because her license has been suspended for "[a]t least a couple of years" for back-owed child support.  (Id.)  She graduated from high school and completed three years of college.[2]  (Id. at 56.)  She receives Medicaid.  (Id.)

Plaintiff last worked in July 2009.  (Id.)  She was working part-time at a restaurant and lost the job due to her depression.  (Id. at 57.)  She has lost other jobs because of her depression, which causes her to isolate herself and sleep a lot.  (Id. at 57.)  She experiences episodes of depression two or three times a month.  (Id. at 84.)  An episode can last between a few hours to a few days.  (Id.)

---

[2]When applying for SSI, Plaintiff reported that she completed a Doctor's Assistant Degree in 1991.  (Id. at 180.)

Plaintiff has a felony conviction for child endangerment resulting from the presence of THC[3] in her youngest daughter's system when born. (Id. at 59-60.) The child is now happy and healthy. (Id. at 60.)

Plaintiff was diagnosed with bipolar disorder approximately two years ago. (Id. at 63-64.) She is currently taking lithium, Depakote, and Seroquel. (Id. at 65.) Plaintiff was hospitalized once for psychiatric reasons. (Id. at 67.) This was for four days in 2005 after she tried to commit suicide. (Id.) On discharge, she was in rehabilitation for thirty days. (Id. at 67-68.) She has been in rehabilitation four times, generally for marijuana. (Id. at 68.) Plaintiff testified that she stopped using marijuana a year and a half ago. (Id.) When questioned about why she was in rehabilitation last July, Plaintiff explained that she used it "a couple of times after she got out." (Id.) She has not used it since her husband threatened to leave her and take their daughter. (Id. at 69.) To ensure her abstinence, she is in counseling. (Id.)

Asked how she spends a typical day, Plaintiff testified that she reads and watches television. (Id. at 71-72.) She cooks and cleans and gets her daughter ready for school. (Id. at 72.) She has to do these chores in spurts with rests between. (Id.)

Plaintiff started having back problems six or seven months earlier. (Id.) There was no precipitating event. (Id.) The epidural injections she has received have provided no relief. (Id. at 74-75.)

---

[3]The transcript refers to "THF," however, later references make it clear it was THC, tetrahydrocannabinol, the primary ingredient in marijuana, that was present in her new-born's blood. (See id. at 407.)

Plaintiff was diagnosed with fibromyalgia approximately three years ago. (Id. at 76.) She takes Savella and Neurontin for it; both help. (Id.) She only notices the fibromyalgia when she does not take her medications. (Id.) She has taken Percocet for pain, but it causes nausea. (Id. at 77.) She was diagnosed with migraines when she was 18. (Id.) She takes medication for them. (Id. at 77-78.) She gets migraines when she is under stress, which is often. (Id. at 78.) Her medications also cause side effects of shaking, racing thoughts, and difficulty concentrating. (Id. at 80-81.) Her hyperactivity expresses itself in anger, irritability, and frustration. (Id. at 82.)

Plaintiff smokes a little over a pack of cigarettes a day. (Id. at 85.) She does not often drink alcohol. (Id.)

Plaintiff also takes medication for high blood pressure. (Id. at 86.)

Plaintiff testified that she can walk for a block and back and stand for fifteen to twenty minutes. (Id. at 89.) She has no problem sitting. (Id.) She has difficulty going up stairs. (Id.) She can lift or carry approximately twenty pounds. (Id.)

Mr. Hammond, testifying as a VE without objection, was asked to assume a hypothetical claimant of Plaintiff's age and education who can do light work and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (Id. at 92, 93.) This claimant is limited to simple, routine tasks; must avoid concentrated exposure to hazardous machinery and unprotected heights; and must never climb ladders, ropes, or scaffolds. (Id. at 93.) He testified that this claimant can perform the work of an usher/ticket taker; an assembler II in the lighting industry; and a hand presser in the laundry industry. (Id.

at 94.)  If this hypothetical claimant is further restricted to only occasional interaction with the public, co-workers, or supervisors and to only occasional changes in the work setting, she cannot perform the work of an usher/ticket taker but can perform the work of the other two positions.  (Id.)  If this hypothetical claimant is unable to regularly and consistently engage in sustained work activity for a full eight-hour day, all three positions would be eliminated. (Id. at 95.)  If the hypothetical claimant is restricted to sedentary work with the additional limitations earlier described, she can perform the work of a circuit board screener, a polisher/assembler in the eye-wear industry, and a semiconductor bonder.  (Id. at 95-96.)  If the claimant cannot perform fine manipulation with her hands, the assembly positions would be eliminated at the sedentary level and all but the usher/ticket taker position at the light level would be eliminated.  (Id. at 96.)

Mr. Hammond further stated that his testimony was consistent with the *Dictionary of Occupational Titles* (DOT).  (Id. at 95.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ includes forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of her mental capabilities.

When applying for SSI,[4] Plaintiff completed a Function Report.  She described her daily activities as being primarily reading and watching television.  (Id. at 187.)  She does household chores during the commercials, but has to sit and rest when the show is on.  (Id.)  She makes sure her daughter, then six years old, wears appropriate clothes and eats well.  (Id. at 188.)  She tries to feed and water her two dogs every day and let them out several times during the day.  (Id.)  Her husband and daughter help.  (Id.)  Even when taking her medications, she wakes up several times a night.  (Id.)  She does not bathe daily and washes her hair once a week.  (Id.)  She talks with friends two or three times a week and talks with family members every day.  (Id. at 191.)  She walks three to four times a week.  (Id.)  Her impairments adversely affect her abilities to lift, squat, bend, stand, walk, kneel, hear, remember, concentrate, understand, climb stairs, and complete tasks.  (Id. at 192.)  She cannot lift anything heavier than ten pounds.  (Id.)  If she walks slowly, she can walk for four blocks before having to stop and rest for approximately fifteen minutes.  (Id.)  She can follow written instructions well, but has difficulty concentrating for longer than a few minutes.  (Id.)  Authority figures intimidate her.  (Id. at 193.)  She does not handle stress or changes in routine well.  (Id.)

A friend of Plaintiff who has known her for twenty-three years completed a Function Report on Plaintiff's behalf.  (Id. at 206-13.)  Her answers were generally consistent with

---

[4]Plaintiff's prior claims for SSI and DIB were denied at the initial level in August 2006 and not pursued further.  (Id. at 175.)

Plaintiff's and emphasized that Plaintiff needed motivation from others to complete any tasks, including personal hygiene tasks. (Id.) Plaintiff's husband also answered some questions about her functioning. (Id. at 229-31.) He reported that she is always sick, can walk "maybe a block," and can lift ten pounds with one hand and twenty with both. (Id. at 229-30.) The only chores she does are laundry and the dishes. (Id. at 230.)

An earnings report lists earnings for the years 1996 to 2005 and 2007 to 2009. (Id. at 167.) Plaintiff's highest annual earnings were $10,287,[5] in 2000. (Id.) Her earnings declined after that – $544 in 2007; $5,758 in 2008; and $3,557 in 2009. (Id.)

A December 2011 letter from the U.S. Department of Education informed Plaintiff that her obligation to repay her student loan was discharged based on her "total and permanent disability." (Id. at 237-40.)

The medical records before the ALJ are summarized below in chronological order, beginning when Plaintiff was seen by Janet P. Myers, D.O., in June 2009 for her complaints of migraine headaches. (Id. at 364.) Plaintiff reported that she had been diagnosed with "'tension migraines'" when she was eighteen years old and that her current migraine had started a few days earlier. (Id.) She further reported that the only medication that worked was Fioricet,[6] prescribed for her by Dr. O'Connor, but she had run out of it. (Id.) Dr. Myers diagnosed Plaintiff with cephalgia, "probably neck induced with migraine features," and

---

[5]All amounts are rounded to the nearest dollar.

[6]Fioricet is a combination of acetaminophen, caffeine, and butalbital, a barbiturate. See What is Fioricet?, http://www.drugs.com/fioricet.html (last visited Mar. 19, 2015).

refilled her prescription for Fioricet, cautioning Plaintiff that she would not refill it again due to its dependence potential. (Id.) Dr. Myers offered to see Plaintiff for osteopathic manipulative therapy to help decrease the frequency and severity of her headaches. (Id.)

In September, Plaintiff consulted Casey Jennings, M.D., at Pike Medical Clinic (PMC) about her neck and shoulder pain. (Id. at 293.) The pain had lasted for the past ten to fifteen years, but was getting worse. (Id.) Also, she had had a cough for the past five days which was preventing her from sleeping and tension headaches that occasionally occurred several times a week. (Id.) She reported that she had tried a friend's Savella (used in the treatment of fibromyalgia), and it had helped. (Id.) She was diagnosed with sinusitis/bronchitis; chronic neck and shoulder pain possibly due to fibromyalgia; and headaches. (Id.) Her prescriptions included Cipro (an antibiotic), prednisone, Phenergan with codeine (used to treat allergy symptoms), Fioricet, Klonopin (for the treatment of anxiety), Savella, and Zanaflex (a muscle relaxer). (Id.) She was to return in three months. (Id.)

When seeing Dr. Jennings in November, Plaintiff wanted to discuss her husband's hepatitis C. (Id. at 292.) Also, she was applying for SSI and wanted to know what diagnoses to use. (Id.) Plaintiff was diagnosed with bronchitis, fibromyalgia, and hepatitis C exposure. (Id.)

Plaintiff returned to Dr. Jennings the next month to talk about her SSI application and her worsening shoulder and neck pain. (Id. at 290-91.) Also, she had pain in the right side of her face and a headache every afternoon in that area. (Id. at 291.) She requested that he dictate a general letter stating that she cannot work at all. (Id.) He declined, but told Plaintiff

to get a form with specific questions that could be answered.  (Id.)  Plaintiff was diagnosed with sinusitis and fibromyalgia and prescribed an antibiotic, Amoxil.  (Id.)

Plaintiff was seen by a provider[7] at PMC in January 2010 for her complaints of sinus pressure, headaches, runny nose, and bilateral ear pain.  (Id. at 289.)  She was diagnosed with acute sinusitis and prescribed an antibiotic.  (Id.)  Plaintiff returned to Dr. Jennings in March for treatment of a sore throat, painful ears, fatigue, and lack of appetite.  (Id. at 287-88.)  Her diagnoses was unchanged.  (Id. at 287.)  In April, she was seen at PMC for complaints of a severe headache and nausea.  (Id. at 286.)

Plaintiff next saw Dr. Jennings on July 2, complaining of bilateral ear pain, lightheadedness when standing up, fatigue, and worsening migraines.  (Id. at 284.)  It was noted that Plaintiff "over exaggerated multi[iple] tender points," making it difficult for him to do an examination.  (Id.)  She was to have lab work done to investigate her complaints of fatigue, lightheadedness, and dizziness and was given a refill of the Fioricet for her migraines.  (Id.)

Plaintiff went to the emergency room at Hannibal Regional Hospital on July 14 with complaints of worsening depression during the past two weeks due to the stress of "dealing with the custody of her youngest child."  (Id. at 374-91.)  Her relevant medical history included depression, fibromyalgia, migraines, and hypertension.  (Id. at 375.)  She did not drink alcohol, but did occasionally smoke marijuana.  (Id.)  She did not have chronic pain.  (Id. at 384.)  On examination, Plaintiff was alert and oriented to person, place, and time and

---

[7]The name is illegible.

had a normal mood and affect. (Id. at 377.) She thought about suicide, but thoughts of her daughter prevented her from doing it. (Id. at 34, 377.) A urine drug screen was positive for barbiturates and marijuana. (Id. at 379.) Her potassium levels were critically low; consequently, Plaintiff was given potassium chloride, K-Dur. (Id. at 380, 389.) She was admitted, diagnosed with depressive disorder, treated, and discharged home within twenty-four hours after she reported that she was feeling "slightly better," was ready to go home, and would follow up with another provider for drug and psychological treatment. (Id. at 383.)

On July 19, Plaintiff was screened at Preferred Family Healthcare (PFH) for a residential treatment program. (Id. at 255-70.) Her treatment history included four residential treatments in 2005, two of which she did not complete, and one hospitalization. (Id. at 266.) Her psychiatric status included, both in the past thirty days and during her lifetime, serious depression, serious anxiety or tension, comprehension or memory problems, serious suicidal thoughts, and medications for psychological or emotional problems. (Id. at 265.) Her drug and alcohol use included, in the past thirty days, twelve days of use of barbiturates, five days of use of cannabis, and twelve days of use of other opiates/analgesics. (Id. at 261.) During her lifetime, she had used alcohol to a point of intoxication for twenty-five years, cannabis for twenty-two years, barbiturates for twenty-four years, and other opiates/analgesics for twenty-four years. (Id.) Her major substance abuse problem was cannabis. (Id.) She had voluntarily abstained from using it for thirty-six months; this abstinence had ended at least eight years earlier. (Id.) Plaintiff's current problems included substance abuse, family members and friends, employment and financial, violence and aggression, suicide attempts,

health, depression, mood swings, eating problems, anxiety, sleep, sexual, and anger. (Id. at 257.) Her current medications included trazodone (an anti-depressant), Paxil (an anti-depressant), Klonopin, Zanaflex, Savella, and metoprolol (for high blood pressure). (Id.) Randall R. Bacon, M.S., L.P.C.,[8] diagnosed Plaintiff with opioid dependence; agoraphobia without a history of panic disorder; major depressive disorder, recurrent, severe, without psychotic features; ADHD; and cannabis dependence. (Id. at 269.) Her current Global Assessment of Functioning (GAF) was 48.[9] (Id. at 270.)

Plaintiff had a counseling session with Robert Parsonson, D.O., on July 21. (Id. at 275-76.) Her complaints included multiple somatic complaints, depression, anxiety, racing thoughts, irritability, and insomnia. (Id. at 275.) On the checklist format for the session notes, Dr. Parsonson circled "groomed" for appearance, "cooperative" for attitude, "pressured" for speech, and "organized" for thought. (Id.) He wrote "poor" for impulse control and judgment and "labile" for mood. (Id.) The list of symptoms under the headings for depression and anxiety were not checked. (Id. at 276.) He diagnosed Plaintiff with bipolar I disorder, mixed, and polysubstance abuse. (Id.) He prescribed Paxil, trazodone, and lithium (used to treat manic depression). (Id.) Plaintiff was to return in two weeks. (Id.)

---

[8]Licensed Professional Counselor.

[9]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

When seen by Dr. Parsonson on August 5, Plaintiff's only concern was constipation. (Id. at 273-74.) Her attitude, appearance, and thought were as before. (Id. at 273.) Her mood was euthymic, her speech was normal, and her judgment and impulse control were fair. (Id.) Her diagnosis was depression with anxiety. (Id. at 274.) Her medications were renewed; however, the dosage of lithium was reduced. (Id.) Mellaril, an antipsychotic, was also prescribed. (Id.)

On August 13, Plaintiff was described by Dr. Parsonson as "ok." (Id. at 271-72.) The only changes to the checklist were a notation above insight, impulse control, and judgment that those abilities were, according to her history, poor. (Id. at 271.) Her diagnosis was major depressive disorder with anxiety. (Id. at 272.) Her prescriptions were refilled. (Id.) The session lasted half the time as the first two. (Id. at 271.)

Having successfully completed the residential program, Plaintiff was discharged on August 19. (Id. at 279-81.)

The next day, Plaintiff went to PMC to discuss her fibromyalgia and headaches. (Id. at 283.) Her prescriptions for Paxil, trazodone, lithium, and Neurontin (used in the treatment of nerve pain) were refilled. (Id.)

Plaintiff returned to PMC on September 8 for treatment of her headaches and hypertension. (Id. at 296.) Her hypertension was stable as long as she took her medication. (Id.) She wanted something for her headaches, but was referred to a headache clinic. (Id.) Three weeks later, Plaintiff reported to Dr. Jennings that she was frequently sleeping all the

time, was achy, and had low back pain that radiated to both legs, but primarily to the left. (Id. at 295.) She requested, and was granted, a refill of her medications. (Id.)

Plaintiff was interviewed on March 8, 2011, for an initial clinical/psycholosocial assessment at PFH, and the assessment was issued eight days later. (Id. at 345-55, 432-43.) Plaintiff explained that she needed their help because she was bipolar and depressed and could not get motivated to do anything. (Id. at 345-46.) She also suffered from back pain, joint pain, bursitis in both shoulders, and fibromyalgia. (Id. at 346.) These physical impairments limit her daily functioning and result in such pain that she often stays in bed. (Id.) Plaintiff reported that she has been bipolar and depressed since she was six years old. (Id. at 347.) She was always anxious and nervous and did not know how to relax. (Id.) When "really stressed," she smokes marijuana to relax. (Id.) On examination, Plaintiff had a disheveled appearance and appropriate interview behavior. (Id. at 348.) She was oriented to person, place, time, and situation. (Id.) Her rate of speech and judgment were normal; her memory was intact. (Id.) She walked without difficulty and was able to stay focused. (Id.) She had a flat affect and ideas of helplessness. (Id.) She reported that she had no problem with alcohol, having never drank again after getting drunk once when she was a senior in high school. (Id.) She further reported that she did not have a substance abuse problem. (Id.) She did not see her continued use of marijuana to relax as a problem and did not intend to stop smoking it. (Id.) She had started using marijuana and cocaine when she was twenty-four. (Id.) Plaintiff read to her daughter every day. (Id.) Plaintiff reported that she had three good friends. (Id. at 351.) Her husband, family, and friends were her support system. (Id.)

Plaintiff was diagnosed with bipolar I disorder and polysubstance (marijuana and cocaine) abuse. (Id. at 349.) Her current GAF was 49. (Id.) Plaintiff was found to be eligible for PFH services with goals of maintaining psychiatric stability, a healthy lifestyle, individual counseling, financial stability, and remaining drug free. (Id. at 353-54.) Barriers to obtaining the first three and the fifth goals were her non-compliance and lack of motivation. (Id. at 353, 354.) A barrier to the fourth goal, financial stability, was the possible denial of her SSI claim. (Id. at 354.) The fifth goal was deferred due to Plaintiff's lack of interest in stopping her use of marijuana. (Id.)

On March 18, Plaintiff went to the emergency room at Pike County Memorial Hospital for treatment of a migraine headache that had begun that day. (Id. at 409, 428-30.) Plaintiff was given medication and told to follow up with her primary care physician in one or two days. (Id. at 430.)

In April, Plaintiff underwent studies of her upper gastro-intestinal track to investigate her complaints of bloating and weight gain and a chest x-ray to investigate her complaints of wheezing and chest pain. (Id. at 418-20.) The former showed no abnormalities. (Id. at 418-19.) The latter showed a degenerative change in her spine but no evidence of acute cardiopulmonary disease. (Id. at 420.)

In August, Plaintiff saw Dr. Jennings for complaints of an urinary tract infection, back and flank pain, sinus problems, and abdominal pain. (Id. at 521.) Plaintiff reported that she generally felt bad and had difficulty moving in the morning. (Id.) Blood tests and urine screens were performed. (Id. at 526-29.)

In September, Plaintiff consulted PMC practitioners about a cyst on her back and sinus problems.  (Id. at 519.)  She was prescribed an antibiotic and referred to a surgeon for the removal of the cyst.  (Id. at 519-20.)

In November, she saw a PMC practitioner for her complaints of laryngitis, sore throat, sinus drainage, headache, and ear pain for the past four days.  (Id. at 517.)  Plaintiff was diagnosed with sinusitis and pharyngitis and prescribed antibiotics.  (Id.)  It was noted that she was smoking one pack of cigarettes a day.  (Id.)

The same day, Plaintiff had various tests performed at Pike County Memorial Hospital, including an electrocardiogram (EKG) which revealed a possible left atrial enlargement and an incomplete right bundle branch block.  (Id. at 410-17, 530-32.)

On November 29, Plaintiff saw Jan F. Onik, D.O., at PMC for a check up and for complaints of diarrhea for the past four days.  (Id. at 516.)  Also, she needed a drug screen.  (Id. at 516.)  It was noted that she had not been taking her blood pressure medication, but had been smoking a pack of cigarettes a day.  (Id.)  Her blood pressure was high; Plaintiff was told she must take her medication.  (Id.)  The drug screen was negative.  (Id. at 525.)

Plaintiff returned on December 5 for a recheck of her blood pressure; it was still high.  (Id.)

As a result of the EKG results, Plaintiff saw Mikhail Bassem, M.D., on December 12 for her complaints of occasional chest pain occurring in clusters and of worsening shortness of breath on exertion.  (Id. at 361-63.)  She smoked one pack of cigarettes a day, and had done so for twenty-five years.  (Id. at 361.)  She had used marijuana and a combination of

Klonopin and methamphetamine, but had not used either recently. (Id.) His examination findings were normal, with the exception of findings of anxiety and depression. (Id. at 362-63.) Plaintiff was to have a stress test and echocardiogram. (Id. at 363.) The echocardiogram revealed a normal left ventricular ejection fraction and mild tricuspid regurgitation. (Id. at 357-58.) The stress test was normal and indicated that Plaintiff was at "a very low risk for hard cardiac events." (Id. at 359-60.)

Two weeks later, Plaintiff had a cyst removed from her back by Peter D. Perll, M.D. (Id. at 423-27.) She was to return in two weeks for a follow-up visit. (Id. at 425.)

On January 9, 2012, Plaintiff consulted Dr. Onik about sinus problems, acid reflux, and pain in her right eye. (Id. at 514, 523-24.) A urine drug screen was positive for barbiturates but negative for marijuana. (Id. at 523.) Her diagnoses included gastroesophageal reflux disease (GERD), chronic obstructive pulmonary disease (COPD), chronic cough, and sinusitis. (Id. at 514.)

Plaintiff returned to PMC on January 18 to consult a provider about her low back and hip pain for the past four to six months that was progressively getting worse. (Id. at 513.) Also, her sinus problems were not getting better. (Id.) Two days later, she had a computed tomography (CT) scan of her lower back, revealing mild multilevel disc disease without evidence of marked canal or foraminal stenosis; moderate facet degenerative joint disease and small foci of air about the thecal sac at L3-L4; and bilateral tiny nonobstructive renal calculi. (Id. at 421-22.)

In February, Plaintiff consulted Luvell Glanton, M.D., about her low back pain, explaining that the pain had been gradual and intermittent for the past nine months. (Id. at 366-69, 469-72.) The pain did not radiate; was aggravated by twisting, standing, and walking; and was relieved by bed-rest, changing positions, and sitting. (Id. at 366.) The pain interfered with her personal grooming, walking, bathing, cooking, sweeping, gardening, vacuuming, leisure activities, and, minimally, sleeping. (Id.) Her current medications included lithium, Depakote (for bipolar disorder), Seroquel (also for bipolar disorder), lisinopril (for high blood pressure), metoprolol (also for high blood pressure), gabapentin (the generic form of Neurontin), Savella, potassium, ranitidine (for heartburn), Fioricet, and hydrochlorothiazide (a diuretic). (Id.) Her neck was stiff and sore. (Id. at 367.) She had low back pain, joint pain, and fibromyalgia. (Id.) She was not anxious, depressed, or irritable. (Id.) She was well groomed and was oriented to time, place, and person. (Id. at 368.) Her low back was moderately tender on palpation. (Id.) She had no clubbing or swelling in her upper and lower extremities. (Id.) She smoked, but was ready to quit. (Id. at 369.) Dr. Glanton noted that her x-ray was consistent with lumbar facet arthopathy and recommended a median branch block at L1-L2 through L5-S1. (Id.)

On March 8, Plaintiff underwent a median branch block at L1-L2 through L5-S1. (Id. at 370-73, 473-74, 508.)

Also on March 8, Plaintiff had an annual assessment at PFH. (Id. at 322-44, 444-49.) Asked how well she was maintaining her house, Plaintiff replied "'pretty good.'" (Id. at 326.) Asked how well she communicated with others, Plaintiff replied that she was a good listener,

"'a great people person,'" dealt well with people, and could talk to strangers, but did not like conflict and had difficulty showing her feelings. (Id. at 326, 341.) She has two friends she has known for a long time and is friends with her husband's ex-wife. (Id. at 334.) She does household chores during the commercials on television. (Id. at 327.) Her diet was primarily meat and processed food. (Id. at 329.) She was able to independently plan and cook meals and shop for groceries. (Id.) Plaintiff had used marijuana during the past year, but had not used any other illegal drugs or alcohol. (Id. at 331.) She smoked a pack of cigarettes a day and did not want to quit. (Id.) Her only hobby or leisure activity was reading. (Id. at 332.) Her only other interest was cooking. (Id.) She did not like to leave the house and preferred to be by herself. (Id. at 335.) Plaintiff was again diagnosed with bipolar I disorder, mixed. (Id. at 341.) She was also diagnosed with cannabis dependence. (Id.) Her current GAF was 52.[10] (Id.) It was noted that Plaintiff was trying to reduce her use of marijuana in order to regain custody of her youngest daughter. (Id. at 343.) The daughter lived with her, but was under the formal custody of another person. (Id.) It was noted that Plaintiff considered her use of marijuana and her depression to be closely related. (Id.) Her counselor thought Plaintiff continued to occasionally use marijuana, but did not talk about. (Id. at 331.) The counselor also thought that Plaintiff was not "'dedicated to sobriety.'" (Id.) Plaintiff reported that she saw a counselor at another location who was "'like a friend.'" (Id. at 323.)

---

[10] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Plaintiff had a follow-up appointment with Dr. Onik on April 3. (Id. at 512, 522.) Her cholesterol levels were high. (Id. at 522.) Plaintiff returned six days later to discuss her weight gain and sore throat and for a refill of her medications. (Id. at 510.) Her diagnoses were obesity, hyperlipidemia, and bipolar. (Id.) She was to return in three months.

Three days later, on April 12, Plaintiff had another median branch block at L1-L2 through L5-S1, following which her pain decreased from nine on a ten-point scale to three. (Id. at 475-76, 502-08.) On April 26, Plaintiff underwent a radio-frequency ablation of the medial branch nerves of L1-L2 through L5-S1. (Id. at 477-79, 495-501.)

Plaintiff was evaluated at PFH on May 15 by a psychiatrist, Lyle Clark, M.D.[11] (Id. at 451-53, 562-64.) She reported that she had been responding "fairly well" to her medications, but might be "having significant irritability." (Id. at 451.) She described symptoms of a major depressive episode and of a manic episode. (Id.) She also described previous symptoms of cannabis dependence, including "consistent use despite persistent problems," but reported she had stopped using marijuana less than a year earlier. (Id.) Plaintiff further reported that her symptoms had first occurred when she was a child, that she had not had any psychiatric hospitalizations, and that she had twice tried to commit suicide by overdosing. (Id. at 452.) She had no current stressors causing difficulties. (Id.) On examination, Plaintiff was appropriately dressed with adequate hygiene, pleasant, and cooperative. (Id.) Her speech was normal; her intellect was average; her thoughts were logical; her mood was neutral; her affect was appropriate; her insight and judgment were

_____

[11]These records were also submitted to the Appeals Council.

adequate.  (Id.)  Dr. Clark diagnosed Plaintiff with bipolar I disorder, mixed, moderate, chronic, with rapid cycling, and cannabis dependence, in early full remission.  (Id. at 453.) Her current GAF was 42.  (Id.)  Her medications included Seroquel, lithium, and Depakote. (Id.)

Plaintiff returned to Dr. Glanton on May 23, reporting that the previous procedure had not helped.  (Id. at 480-83, 487-90.)  She characterized her back pain as being a constant ache and occurring with movement.  (Id. at 482.)  The pain was a three on a ten-point scale.  (Id.) She continued to smoke.  (Id. at 483.)  A lumbar epidural steroid injection was discussed, and was administered two days later.  (Id. at 483-85, 490, 492-94.)

In addition to the foregoing records, the ALJ had before her the progress notes of Christina Ross, Psy.D, for Plaintiff's therapy sessions from August 16, 2011, through March 29, 2012, inclusive.  Her only diagnosis was generalized anxiety disorder.  Those session notes are summarized as follows.

On August 16, Plaintiff reported that she was anxious daily.  (Id. at 407.)  She had formerly used marijuana to calm down, but wanted to quit.  (Id.)  Her current GAF was 60. (Id.)  Two weeks later, Plaintiff reported being able to fairly function since her last session. (Id. at 406.)  She had had a disagreement with her daughter's guardian but had been able to work it out.  (Id.)  Her current GAF was 55.  (Id.)  She had difficulty staying on topic.  (Id.) Plaintiff was described in the notes of the next, September 20 session as having a good response to treatment.  (Id. at 405.)  Her medications had changed, but she still felt like she was manic.  (Id.)  She agreed to stop smoking marijuana.  (Id.)  Her homework was to take

a bath every other day, go for a walk on those days, and wash her hair every other bath. (Id.) On September 27, Plaintiff reported that she felt like her mood was stabilizing. (Id. at 404.) She was frustrated with her daughter for getting into trouble at school. (Id.) She felt like her daughter needed medication; however, she was not allowed to give her any. (Id.) She did anyway and told her daughter to keep it a secret. (Id.) This approach was advised against. (Id.) On October 11, Plaintiff reported that her daughter's guardian had taken her daughter away for a few days. (Id. at 403.) Plaintiff was maintaining her hygiene. (Id.) The next week, Plaintiff reported being bored and nervous about an upcoming court date to regain full custody of her daughter. (Id. at 402.) On November 15, Plaintiff was frustrated because the court date had been continued; however, she was getting housework done when her daughter was at school and her husband at work. (Id. at 401.) One week later, Plaintiff was continuing to feel better and have more energy. (Id. at 400.) The court date had been continued again. (Id.) She was doing more around the house. (Id.) She and her daughter were doing activities together, including cooking. (Id.) On November 29, she reported that she felt better and had more energy. (Id. at 399.) She reported the same on December 6. (Id. at 398.) Her daughter was away on vacation. (Id.) Plaintiff was doing well with keeping up with the housework and was described as doing well overall. (Id.) Her GAF had increased to 60. (Id.) On December 20, Plaintiff was continuing to feel better. (Id. at 397.) Pain in her back limited what she could do each day. (Id.) Again, on January 3, 2012, Plaintiff reported that she was continuing to feel better (Id. at 396.) At the next, February 21 session, Plaintiff reported having fluctuating symptoms. (Id. at 395.) She had not been awarded full custody of her

daughter; instead, her sister and a friend were co-guardians. (Id.) On March 13, she described fluctuating symptoms. (Id. at 394.) She was not speaking with her mother or sister. (Id. at 394.) Her symptoms were described as fluctuating at the next, March 29 session. (Id. at 393.) Her GAF was 60. (Id.) She could not exercise because of back pain. (Id.) Small changes in diet were discussed. (Id.)

Also before the ALJ were reports of assessments of Plaintiff's mental limitations and abilities.

In October 2010, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Mark Altomari, Ph.D. (Id. at 300-11.) Plaintiff was assessed as having affective disorders, i.e., bipolar disorder, major depressive disorder with anxiety, and depression, and substance addiction disorders, i.e., continuous alcohol and marijuana dependence. (Id. at 300, 303, 306.) These disorders resulted in mild restrictions in her daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 308.) They did not cause any repeated episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Altomari assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in two. (Id. at 297.) In the area of sustained concentration and persistence, she was moderately limited in two of the eight listed abilities, i.e., (i) carrying out detailed instructions and (ii) maintaining attention and concentration for extended periods, and was not

significantly limited in the other six abilities. (Id. at 297-98.) In the area of social interaction, Plaintiff was not significantly limited in all of the five listed abilities. (Id. at 298.) In the area of adaptation, she was not significantly limited in three of the four abilities and was moderately limited in her ability to travel in unfamiliar places or use public transportation. (Id.)

On a Medical Source Statement of Ability to Do Work Related Activities (Mental), Dr. Onik assessed Plaintiff as having moderate limitations in her abilities to understand, remember, and carry out simple instructions; to make judgments on simple or complex work-related decisions; and to carry out complex instructions, but only mild limitations in her abilities to understand and remember complex instructions. (Id. at 313, 533.) Her ability to interact with others is affected by her impairments. (Id. at 314, 534.) Specifically, she has marked limitations in her abilities to interact appropriately with the public, co-workers, and supervisors and in her abilities to respond appropriately to usual work situations and to changes in a routine work setting. (Id.) Asked to identify the factors that supported his assessment, Dr. Onik responded that Plaintiff is unable to interact with co-workers. (Id.) No other capabilities were affected by her impairments. (Id.) He agreed with Plaintiff that her disability began on June 9, 2010. (Id.) Dr. Onik completed the assessment in June 2011 and identified his medical speciality as being a general family practitioner. (Id. at 315.)

### The ALJ's Decision

The ALJ first determined that Plaintiff has not engaged in substantial gainful activity since her SSI application date of July 29, 2010. (Id. at 12.) She next found that Plaintiff has

severe impairments of lumbar disc disease, fibromyalgia, migraine headaches, hypertension, bipolar disorder, and substance abuse, in early remission. (Id.) She did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id.)

Addressing Plaintiff's mental impairments, the ALJ found her to have mild restrictions in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id. at 13.) The ALJ noted that Plaintiff's daily activities included caring for her young daughter and her pets, doing household chores during commercials, and generally being independent in self-care. (Id.) She has not had any episodes of decompensation of extended duration. (Id.)

The ALJ next determined that Plaintiff has the RFC to perform sedentary work except she is additionally limited to only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs. (Id.) She is not to climb ladders, ropes, or scaffolds. (Id.) She is to avoid concentrated exposure to hazardous machinery and to unprotected heights. (Id.) Also, she is limited to performing simple and routine tasks with only occasional interaction with supervisors, coworkers, and the public and occasional changes in the work setting. (Id.) In making this determination, the ALJ found that Plaintiff's descriptions of her limited exertional and mental abilities were not fully credible. (Id. at 14-19.) Those descriptions were not supported by the objective medical evidence. (Id. at 15-18.) For instance, her blood pressure was stable when she took her medication and her mental impairments improved with treatment. (Id.) Although she was hospitalized in July 2010 for

suicidal ideation, she responded to treatment and was discharged within twenty-four hours. (Id. at 15.)  The ALJ noted the various medications Plaintiff had been prescribed and the treatment she had undergone, also noting her complaints of adverse side effects of hand tremors, weakness, and fatigue and finding those complaints to not be substantiated by the medical record and to be inconsistent with her daily functioning.  (Id. at 14, 15, 19.)  Other detractors from her credibility were her work history; the exaggeration of tender points; the refusal of Dr. Jennings to issue a statement of disability; inconsistencies in the record, e.g., differing reports of when the onset of back pain occurred and of how often her headaches occurred; and the lack of any limitations placed on her by any medical source due to back pain.  (Id. at 18-19.)

Addressing the opinion of Dr. Onik, the ALJ found it lacked sufficient support, finding it to be inconsistent with the record and noting that he was a family care physician and had no expertise in mental health care.  (Id. at 16.)  The ALJ gave some deference to his opinion by finding that Plaintiff had moderate limitations in social functioning.  (Id.)

With her RFC, Plaintiff cannot return to her past relevant work as a fast food restaurant cook.  (Id. at 19.)  With her RFC, age, and education, she can perform work that exits in the national economy as described by the VE.  (Id. at 19-20.)

The ALJ concluded that Plaintiff is not disabled within the meaning of the Act.  (Id. at 21.)

## Additional Records Before the Appeals Council

Plaintiff submitted to the Appeals Council records from Dr. Glanton that were not before the ALJ. The earliest of these is of her June 19, 2012, visit to Dr. Glanton for a recheck of her low back pain. (Id. at 538-41.) Plaintiff reported that the previous treatments had not helped. (Id. at 538.) Her pain was a six on a ten-point scale. (Id. at 539.) On examination, Plaintiff was as before. (Id. at 540.) She was to have an magnetic resonance imaging (MRI) of her lumbar spine and return in three weeks. (Id. at 541.) Again, she was encouraged to stop smoking. (Id.)

The MRI revealed a normal alignment of her lumbar spine; a slight protrusion of the disc at L2-L3 far to the left lateral aspect without evidence of spinal stenosis or mass effect on the nerve root; a moderate generalized bulge of the disc at L3-l4 with degenerate changes in the facets with mild narrowing of the spinal canal in the transverse dimension; a mild to moderate generalized bulge of the disc at L4-L5 with mild narrowing of the neural foramen bilaterally; a far lateral right protrusion of the disc at L5-S1 with mass effect on the right nerve root; and normal paraspinous soft tissue. (Id. at 559-60.)

Six days after the MRI, Plaintiff returned to Dr. Glanton, was diagnosed with L5-S1 disc herniation causing right lumbar radiculopathy, and received a right L5-S1 transforaminal epidural steroid injection. (Id. at 542-45, 550-58.)

One month later, Plaintiff described her pain to Dr. Glanton as a zero, but reported having no relief from the injection. (Id. at 546-49.) She was to be evaluated for surgical

intervention. (Id. at 549.) Weight management was discussed as her body mass index was high. (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do h[er] previous work, but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 416.920(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R.

§ 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009) (Moore I). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of h[er] limitations.'" **Moore I**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore I**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the

national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore v. Astrue**, 623 F.3d 599, 602 (8th Cir. 2010); **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might

have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "'If after reviewing the record,

the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one

of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'"

**Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).

## Discussion

Plaintiff argues that the ALJ committed reversible error when (1) failing to determine

that her bipolar disorder did not satisfy Listings 12.04 (affective disorders) or 12.06 (anxiety-

related disorders); (2) failing to follow Social Security Ruling 96-8p when assessing her RFC;

(3) failing to consider all the relevant factors when evaluating the opinion of her treating

physician; and (4) assessing her credibility.

Listings 12.04 and 12.06.  Plaintiff was diagnosed with bipolar disorder in July 2010.

A diagnosis in and of itself does not meet the criteria for listing-level severity.  20 C.F.R.

§ 416.925(d).  See also **Lott v. Colvin**, 772 F.3d 546, 549 (8th Cir. 2014) ("[M]erely being

diagnosed with a condition named in a listing and meeting some of the criteria will not qualify

a claimant for presumptive disability under the listing.") (internal quotations omitted).  "'An

impairment that manifests only some of those criteria, no matter how severely, does not

qualify.'"  **Blackburn v. Colvin**, 761 F.3d 853, 858 (8th Cir. 2014) (quoting Sullivan v.

Zebley, 493 U.S. 521, 530 (1990)).  "[Plaintiff] bears the burden of establishing that [s]he

meets all the criteria."  **Id.**  Plaintiff argues that she has carried this burden by showing, in

addition to satisfying the criteria of Paragraph A, she satisfies the Paragraph B criteria.[12]

---

[12]There is no contention that Plaintiff satisfies the C criteria.

These criteria are the same for both Listings – her disorder must result in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 40, subpt. P. appx 1, §§ 12.04, 12.06.    Plaintiff contends that her bipolar disorder satisfies these criteria as demonstrated in her consistently low GAF scores reflecting serious symptoms.

Plaintiff's GAF scores range from a low of 42, assigned once by Dr. Clark in May 2012, to 60, assigned several times by Dr. Ross.[13]  The scores indicative of serious symptoms, see note 9, supra, are a 48 assigned in July 2010 when Plaintiff was in residential treatment for marijuana use, a 49 assigned in March 2011 when Plaintiff was being assessed at PFH, and the 42 assigned by Dr. Clark.  The scores indicative of moderate symptoms, see note 10, supra are a 52 at her March 2012 assessment, seven 55s assigned by Dr. Ross, and seven 60s assigned by Dr. Ross, including six 60s assigned between December 2011 and March 2012.[14]

---

[13]Contrary to Plaintiff's position, Dr. Ross, a psychologist, is an acceptable medical source. See 20 C.F.R. § 416.913(a)(2).  See also 20 C.F.R. § 416.902 (defining "treating source" as a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant].").

[14]Although Plaintiff contends that the ALJ "merely sweeps aside the low GAF scores," the Court notes that she dismisses her GAF scores above 50 for an unsupported reason.  See note 13, supra.

Of the professionals evaluating Plaintiff's GAF, only Dr. Ross saw her more than once and only she had a "longitudinal picture" of Plaintiff's mental impairment.  See 20 C.F.R. § 416.927(c)(2)(i) (considering such a picture as a factor weighing in favor of a source's medical opinion).

"The [GAF] score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning."[15] **Jones**, 619 F.3d at 973 (internal quotations omitted).  "[T]he Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings."  **Id.** at 973-74 (third alteration in original) (internal quotations omitted).  Thus, "an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it."  **Id.** at 974 (internal quotations omitted).  In the instant case, the ALJ did just that.  The record before her reflects that the GAF scores indicating serious symptoms were each assigned only once.  The earliest of these was when Plaintiff was in residential treatment for marijuana use.  The next two are when her eligibility for support services was being assessed.  The last, and worst, was assigned by Dr. Clark.  The strength of this rating, however, is weakened by his examination report that she had logical thoughts, appropriate dress and affect, normal speech, and adequate hygiene, insight, and judgment.

---

[15]The Court notes that GAF scores are not used in the Fifth Edition of the Diagnostic and Statistical Manual.  See The Removal of the Multiaxial System in the *DSM-5*, http://tpcjournal.nbcc.org/the-removal-of-the-multiaxial-system-in-the-dsm-5-implications (last visited March 23, 2015).

Plaintiff further argues that the ALJ erred in her assessment of the degree to which Plaintiff is restricted in her activities of daily living, correctly noting that "'a claimant need not be completely bedridden . . . to be considered disabled.'" **Toland v. Colvin**, 761 F.3d 931, 936 (8th Cir. 2014) (quoting Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (alteration in original). Plaintiff is not bedridden. She cares for her young daughter and family pets. She does household chores. Although she testified she does these chores during commercial breaks on television, she told Dr. Ross that she was keeping up with the housework. See **Kamann v. Colvin**, 721 F.3d 945, 951-52 (8th Cir. 2013) (affirming ALJ's credibility finding based on discrepancies between claimant's self-reported limitations and observed capacities); **Whitman v. Colvin**, 762 F.3d 701, 705 (8th Cir. 2014) (deferring to credibility finding of ALJ who discounted the claimant's allegations of limited daily activities on the grounds that the activities could not be objectively verified and that, even if they were as restricted as alleged, the degree of limitation could not be attributed to his medical condition).

Citing the Seventh Circuit case of **Punzio v. Astrue**, 630 F.3d 704, 710 (7th Cir. 2011), Plaintiff further argues that any ability to occasionally function in her activities of daily living must be viewed in the context of mental illness and that people suffering from such illness will have good days and bad days. In that case, the court found that the ALJ had "cherry-pick[ed]" the notes of the claimant's treating psychiatrist "to locate a single treatment note that purportedly undermines [the psychiatrist's] overall assessment of [the claimant's] functional limitations." Plaintiff's reliance on this case is unavailing. Indeed, the notes of her treating psychologist detract from Plaintiff's description of her functional limitations. And,

unlike the long history of mental illness treatment and troubles of the claimant in **Punzio**, apart from the sessions with Dr. Ross, Plaintiff's history reflects sporadic mental health treatment.

Social Security Ruling 96-8p. Plaintiff argues that the ALJ's RFC findings do not include the specificity required by Social Security Ruling 96-8p. That Ruling "cautions that a failure to make [a] function-by-function assessment [of a claimant's RFC] could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1). An ALJ does not, however, fail in her duty to assess a claimant's RFC merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which she found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record"). Additionally, an "ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC, if the court can otherwise discern the elements of the ALJ's decision-making." **Jones v. Astrue**, 2011 WL 4445825, *10 (E.D. Mo. Sept. 26, 2011) (citing Depover, 349 F.3d at 567). See also **Hilgart v. Colvin**, 2013 WL 2250877, *4 (W.D. Mo. May 22, 2013) (finding that a requirement that an ALJ "follow each RFC limitation with a list of specific evidence on which the ALJ relied" to be

inconsistent with the court's duty to base its decision on "all the relevant evidence") (internal quotations omitted).

Plaintiff notes that she takes a lot of medications, but argues the ALJ failed to mention what she takes and how it affects her. When summarizing the medical records, the ALJ did identify the medications Plaintiff takes. The ALJ also referenced her complained side effects of hand tremors, weakness, and fatigue.

The evidence is that Plaintiff's hypertension and fibromyalgia were stable when she took the prescribed medication. "Impairments that are controllable or amenable to treatment do not support a finding of disability." **Davidson v. Astrue**, 578 F.3d 838, 846 (8th Cir. 2009); accord **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). The evidence also is that Plaintiff did not regularly pursue medical treatment for her mental illness or her migraines. She argues that this is a reflection of her mental illness and the ALJ erred by not considering it as such.

There is no evidence that any failure of Plaintiff to take medication or seek regular mental health treatment was attributable to her mental illness. Cf. **Pate-Fires**, 564 F.3d at 945-46 (holding that ALJ had erred when finding that medical noncompliance of claimant with bipolar disorder and long history of mental disorders and of numerous hospitalizations for psychotic episodes and who had indicated that she stopped taking her medications because she did not feel like she needed them was not justifiable; evidence "overwhelmingly demonstrate[d]" that "noncompliance was attributable to [claimant's] mental illness"). Indeed, Plaintiff sought mental health treatment when such was advantageous. For instance, she was

evaluated twice at PFH in order to be eligible for their services. When engaged in court proceedings to gain full custody of her daughter, she sought counseling from Dr. Ross. There is nothing in the record to support her argument that the nature of her treatment was affected in any way by her mental impairments. See e.g. **Pratt v. Astrue**, 372 Fed. App'x 681, 682 (8th Cir. 2010) (per curiam) (holding that ALJ's credibility finding was supported by, inter alia, lack of mental health treatment).

Dr. Onik's MSS. On a Medical Source Statement of Ability to Do Work Related Activities (Mental) (MSS), Dr. Onik assessed Plaintiff as having moderate limitations in her abilities to understand, remember, and carry out simple instructions; to make judgments on simple or complex work-related decisions; and to carry out complex instructions, but only mild limitations in her abilities to understand and remember complex instructions. Also, she has marked limitations in her abilities to interact appropriately with the public, co-workers, and supervisors and in her abilities to respond appropriately to usual work situations and to changes in a routine work setting. Plaintiff contends that the ALJ erred by not giving this MSS the deference it was due given that Dr. Onik is her treating physician.

When evaluating opinion evidence, an ALJ is required to explain in her decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. § 416.927(c)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than to those of other sources. 20 C.F.R. § 416.927(c)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Id.; see also **Forehand v. Barnhart**, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. § 416.927(c). The Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." Id. Inconsistency with other substantial evidence alone is sufficient to discount a treating physician's opinion. **Goff**, 421 F.3d at 790-91.

Plaintiff saw Dr. Onik for physical problems, e.g., diarrhea, blood pressure, sinus problems, high cholesterol. The examination portion of his treatment notes are in a checklist format with no line designated for psychological findings.[16] He identified his specialty as

---

[16]There is a line titled "Other" under Review of Symptoms and under Exam.

general family practice.  See **Brown v. Astrue**, 611 F.3d 941, 953 (8th Cir. 2010) (holding that "[g]reater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, [e.g., a psychiatrist,] than to the opinion of a non-specialist") (quotations omitted); **Brosnahan v. Barnhart**, 336 F.3d 671, 676 (8th Cir. 2003) (ALJ did not err in discounting psychologist's opinion about claimant's physical impairments as those impairments were outside his area of expertise).  Where limitations in a treating physician's opinion stand alone, were never mentioned in the physician's numerous treatment records, and are not supported by any objective testing or reasoning, the ALJ does not err in discounting that physician's opinion.  **Cline v. Colvin**, 771 F.3d 1098, 1103-04 (8th Cir. 2014).

Additionally, the Court notes that Dr. Onik used a MSS when assessing Plaintiff's mental functional limitations.  "An MSS is a checklist evaluation in which the responding physician ranks the patient's abilities, and is considered a source of objective medical evidence."  **Reed v. Barnhart**, 399 F.3d 917, 921 (8th Cir. 2005) (internal quotations omitted).  In **Johnson v. Astrue**, 628 F.3d 991, 994 (8th Cir. 2011), the court noted the use by one of the claimant's treating physicians of the MSS form – "consist[ing] of a series of check marks assessing [RFC]" – and held that the ALJ may discount the "conclusory opinions" reflected in the MSS "if contradicted by other objective medical evidence in the record."  See also **Reed**, 399 F.3d at 921 (noting that the court "[has] upheld an ALJ's decision to discount a treating physician's MSS where the limitations listed on the form 'stand alone' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning'") (second alteration in original).

In addition to the evaluation of Plaintiff's mental abilities being outside Dr. Onik's area of expertise, she had only one visit to PMC before he completed the MSS when she was not seen by Dr. Jennings. This visit was in January 2010 – seven months before her alleged disability onset date – and was for sinus problems, headaches, and a runny nose. Moreover, Dr. Onik's unfamiliarity with her psychological problems was made evident by the only explanation he gave for his findings, i.e., she was unable to interact with co-workers, and by the inconsistency in finding that she had moderate limitations in her abilities to understand and remember *simple* instructions but only mild limitations in her abilities to understand and remember *complex* instructions. The ALJ may properly disregard that portion of a physician's report that is based on the claimant's discredited subjective complaints rather than on objective medical evidence and may discount any conclusions based on those complaints, **Cline**, 771 F.3d at 1104; **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013), or that is internally inconsistent, see **Bernard v. Colvin**, 774 F.3d 482, 487 (8th Cir. 2014); **Grable v. Colvin**, 770 F.3d 1196, 1201 (8th Cir. 2014).

Plaintiff argues that the finding of the U.S. Department of Education that her student loans are discharge because she is totally and permanently disabled supports Dr. Onik's MSS. This argument is unavailing. There is no criteria cited for the discharge and no explanation of the findings on which it is based. See e.g. **Thomas v. Barnhart**, 278 F.3d 947, 957 (9th Cir. 2002) (finding that ALJ properly relied on treating physician's examination findings rather than "unsupported statements of disability in the student loan form").

Credibility.  In her next, and final argument, Plaintiff contends that the ALJ's adverse credibility determination violates Social Security Ruling 96-7p and is patently erroneous because she employed boilerplate language and failed to properly consider the supporting statements of her friend and her husband.[17]

Before beginning her credibility analysis, the ALJ cited 20 C.F.R. § 416.929 and Social Security Rulings 96-4p and 96-7p.  (See R. at 13.)  The Eighth Circuit Court of Appeals has held that 20 C.F.R. §  416.929 "largely mirror the *Polaski* factors."  **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007).  See also **McDade**, 720 F.3d at 998 (citing *Polaski* and 20 C.F.R. § 416.929 when discussing ALJ's credibility determination); **Dipple v. Astrue**, 601 F.3d 833, 836 (8th Cir. 2010) (same); **Wiese**, 552 F.3d at 733 (citing SSR 96-7p and *Polaski* when discussing ALJ's credibility determination).  In the Eighth Circuit, an "'ALJ [is] not required to discuss methodically each *Polaski* consideration, so long as [s]he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints.'"  **McDade**, 720 F.3d at 998 (quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)) (alterations in original).  "'Because the ALJ [is] in a better position to evaluate credibility, [the Court] defer[s] to h[er] credibility determinations as long as they [are] supported by good reasons and substantial evidence.'"  **Id.** (quoting Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)) (first and fourth alterations in original).

---

[17]Plaintiff also argues that the ALJ failed to not properly considering the decision of the U.S. Department of Education.  This argument is without merit for the reasons discussed above.

The ALJ gave good reasons for discounting Plaintiff's credibility, including the lack of supporting objective medical evidence, see **Renstrom**, 680 F.3d at 1066; the absence of any restrictions placed on Plaintiff by any of her treating physicians, see **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011); her poor work record, see **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011); inconsistencies in the record, see **Van Vickle**, 539 F.3d at 828; and exaggeration of tender points, see **Grable**, 770 F.3d at 1202 (ALJ properly found claimant lacked credibility based on symptom exaggeration).

Citing the Seventh Circuit case of **Bjornson v. Astrue**, 671 F.3d 640, 644-45 (7th Cir. 2012), Plaintiff contends that the ALJ's credibility determination must be reversed because it is explained only by boilerplate language, specifically

> "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]."

(Pl.'s Br. at 13, quoting R. at 15.)  That court held in a later decision that reversal is not necessary if the ALJ has "otherwise explained his conclusion adequately." **Filus v. Astrue**, 694 F.3d 863, 868 (7th Cir. 2012).  In the instant case, the ALJ did so.

Moreover, this language, when supported by a consideration of the relevant factors, has been cited by the Eighth Circuit when affirming an ALJ's adverse credibility determination.  See e.g., **Medhaug v. Astrue**, 578 F.3d 805, 814, 816-17 (8th Cir. 2009); **Wiese**, 552 F.3d at 733; **Van Vickle**, 539 F.3d at 827-28.

Plaintiff next argues that the ALJ improperly analyzed her friend's and her husband's corroborative reports. Although the observations of third-parties may support a claimant's credibility, see 20 C.F.R. § 416.929(c)(3) (listing information from other people about a claimant's pain or other symptoms as a factor to be considered when evaluating a claimant's credibility), the friend's report generally attributed any functional limitations to Plaintiff's lack of motivation and added little to the record. See **Buckner**, 646 F.3d at 559-60 (supporting statement of claimant's girlfriend could be discredited for same reasons as was claimant's). Her husband's supportive report was discounted because he "has a financial interest in the outcome of the case"; this is a proper consideration. **Choate v. Barnhart**, 457 F.3d 865, 872 (8th Cir. 2006).

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, is within the zone of choice and will not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  24th  day of March, 2015.